MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ROHR, INC., a Delaware corporation,<br><br>Defendant. | Civil Case No. **'19CV0777 WQHBLM**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Complaint

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). See 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On February 21, 2018, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant Rohr, Inc., a UTC Aerospace Systems Company's ("Rohr"), as owner and operator the Rohr facility located at the Foot of H Street, 850 Lagoon Dr., Chula Vista, California 91910 ("Rohr Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ("General Industrial Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit A and incorporated herein.

3.     Plaintiffs also sent the Notice Letters to the registered agents for Defendant and Defendant's parent company, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Board as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letters were served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is

Complaint                                        1

diligently prosecuting an action to redress the violations alleged in the Notice Letters and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.    Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.    <u>INTRODUCTION</u>

6.    Plaintiffs seek relief for Defendant's substantive and procedural violations of the General Industrial Permit and the Clean Water Act resulting from Defendant's activities at the Rohr Facility.

7.    Specifically, Defendant has discharged and/or continues to discharge polluted storm water from the Rohr Facility to downstream waters and groundwater including the Sweetwater hydrologic unit (groundwater), San Diego Bay Shoreline at Chula Vista Marina, San Diego Bay Shoreline at Bayside Park (J Street), the greater San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301,1342.

8.    Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Industrial Permit.

9.    This complaint further seeks relief to prevent discharges in violation of the General Industrial Permit as amended by *Order No. 2014-0057-DWQ* ("2015 Permit"). These are ongoing and continuous violations of the Clean Water Act and the General Industrial Permit.

10.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial like those conducted at the Rohr Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11.    Among the Receiving Waters are ecologically sensitive areas providing

essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12.   This discharge of polluted storm water and non-storm water from the Facility contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

13.   Storm water and non-storm water contaminated with sediment, heavy metals, pathogens, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.   The polluted discharges from the Rohr Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Coastkeeper's and CERF's members. The public's use of the Receiving Waters for water contact sports exposes people to bacteria, toxic metals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to these waters.

15.   Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act and the General Industrial Permit.

## III.   PARTIES

### A.   Plaintiffs.

16.   Plaintiff San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106.

17.   San Diego Coastkeeper is committed to protecting and restoring the San

Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings, and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters, and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

18.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1140 South Coast Highway 101, Encinitas California, 92024.

19.    CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

20.    Plaintiffs have thousands of members who live and/or recreate in and around the Receiving Waters.  Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

21.    Defendant's failure to comply with the procedural and substantive requirements of the General Industrial Permit and the Clean Water Act results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters, and thus impair Plaintiffs' members' use and enjoyment of those waters.

22.    The violations of the General Industrial Permit and Clean Water Act at the

Rohr Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the General Industrial Permit and the Clean Water Act.

23.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

### B.     The Owner and/or Operator of the Rohr Facility.

24.      Plaintiffs are informed and believe that Rohr, Inc., a UTC Aerospace Systems Company, is an active Delaware corporation, and its registered agent is CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

25.     Plaintiffs are informed and believe that Rohr, Inc. is the Owner and/or Operator of the Facility. *See* 2018 March 2018 Revised Facility SWPPP.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

26.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); see 40 C.F.R. § 122.26(c)(1).

27.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated Sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

29.     The "discharge of a pollutant" means, among other things, "any addition of

any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2.

30.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

31.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

32.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-00.

33.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-01.

34.    Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

35.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with

respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

36.     A corporate entity is a "person" within the meaning of Section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

37.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

38.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring between January 28, 2009 and November 2, 2015, and $54,833 for violations occurring after November 2, 2015. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

39.     Section 505(d) of the Clean Water Act permits prevailing, or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.     California's General Industrial Permit.**

40.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

41.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *Id.*

42.     California is a state authorized by the EPA to issue NPDES permits.

43.     In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

44.     The General Industrial Permit is a statewide general NPDES permit issued

by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. 33 U.S.C. § 1342.

45.    Between 1997 and June 30, 2015, the General Industrial Permit in effect was Order No. 97-03-DWQ ("1997 Permit").

46.    On July 1, 2015, pursuant to Order No. 2014-0057-DWQ ("2015 Permit"), the reissued General Industrial Permit took effect.

47.    The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit.

48.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Industrial Permit and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Industrial Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 Permit § I.A.17.

49.    Violations of the General Industrial Permit are violations of the Clean Water Act. 1997 Permit § C.1; 2015 Permit § XXI.A.

**C.     The General Industrial Permit Discharge Prohibitions and Effluent Limitations.**

50.    The General Industrial Permit contains certain absolute prohibitions. The Discharge Prohibitions provisions prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B. These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 Permit § III.C.

51.     The General Industrial Permit Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 Permit § V.A.

52.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

53.     Pursuant to the CWA and the General Industrial Permit, dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

54.     The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

55.     The EPA Benchmarks provide a relevant and objective standard for evaluating whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. See MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); *see also* 2015 MSGP Fact Sheet at 50; EPA 2008 MSGP Fact Sheet at 106.

56.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Id.*

57.     The EPA Benchmark for TSS is 100 mg/L. 2015 MSGP Fact Sheet at 55-56.

58.     The EPA Benchmark for total zinc in saltwater is 0.09 mg/L. *Id.*

Complaint                                      9

59. The EPA Benchmark for total copper in saltwater is 0.0048 mg/L. *Id.*

60. The EPA Benchmark for oil and grease is 15 mg/L. *Id.*

61. The EPA Benchmark for total aluminum is 0.75 mg/L. *Id.*

62. The EPA Benchmark for total magnesium is 0.064 mg/L. *Id.*

63. The EPA Benchmark for pH is 6.0-9.0 s.u. *Id.*

64. The EPA Benchmark for total lead in saltwater is 0.21 mg/L. *Id.*

65. Failure to develop and/or implement BMPs that constitute BAT and BCT is a violation of the General Industrial Permit. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 Permit § V.A.

**D.     The General Industrial Permit Receiving Water Limitations.**

66. The General Industrial Permit Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 Permit § VI.B.

67. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Industrial Permit's Receiving Water Limitations. *Id.*

68. The General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 Permit § VI.A.

69. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the Beneficial Uses of the waters that receive polluted discharges.

70. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQSs for water bodies within its geographical area.

71. WQSs applicable to dischargers covered by the General Industrial Permit

include, but are not limited to, those set out in the Water Quality Control Plan for the San Diego Basin, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

72.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. See Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), *available at* http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

73.     The CTR sets forth maximum concentration levels of several toxic pollutants such that California can achieve health and environmental protection goals.

74.     The CTR sets forth the following maximum concentrations for saltwater bays and estuaries: lead – 0.21 mg/L; zinc – 0.09 mg/L; copper – .0048 mg/L. 40 C.F.R. § 131.38.

75.     The CTR limit for continuous concentration of chromium (VI) in saltwater bays and estuaries is 0.05 mg/L. *Id*.

76.     The Basin Plan identifies "Beneficial Uses" for water bodies in the San Diego region.

77.     Beneficial Uses for surface waters are designated under the Clean Water Act section 303 in accordance with regulations contained in 40 C.F.R. § 131. The State is required to specify appropriate water Beneficial Uses to be achieved and protected. Basin Plan, at 2-2.

78.     The Beneficial Use designation of surface waters of the state must take into consideration the use and value of water for public water supplies, protection and propagation of fish, shellfish and wildlife, recreation in and on the water, agricultural, industrial and other purposes including navigation. *Id*.

79.     The Beneficial Uses for the San Diego Bay include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation,

Complaint                                    11

Commercial and Sport Fishing, Wildlife Habitat, Estuarine Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, and Rare, Threatened, or Endangered Species. Basin Plan at Table 2-3.

80.     The Beneficial Uses for the Pacific Ocean include: Industrial Service Supply, Navigation, Contact Water Recreation, Non-Contact Water Recreation, Commercial and Sport Fishing, Wildlife Habitat, Preservation of Biological Habitats of Special Significance, Marine Habitat, Migration of Aquatic Organism, Spawning Reproduction, and/or Early Development, Shell Harvesting, Aqua Culture, and Rare, Threatened, or Endangered Species. *Id.*

81.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

82.     According to the 2016 303(d) List of Impaired Water Bodies, San Diego Bay Shoreline at Chula Vista Marina is impaired for copper.

83.     According to the 2016 303(d) List of Impaired Water Bodies, San Diego Bay Shoreline at Bayside Park (J Street) is impaired for enterococcus for the contact recreational Beneficial Use, and total coliform for the shellfish harvesting Beneficial Use.

84.     According to the 2016 303(d) List of Impaired Water Bodies, the greater San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAH"), and polychlorinated biphenyls ("PCBs").  Other areas of San Diego Bay and its shorelines are impaired for benthic community effects, sediment toxicity, total coliform, enterococcus, fecal coliform, and chlordane.

85.     Polluted discharges from industrial facilities, such as the Rohr Facility, contribute to the degradation of these already impaired surface waters, as well as aquatic-dependent wildlife.

86.     Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

87.     In adopting the CTR, the EPA expressly directed that "[a]ll waters (including lakes, estuaries and marine waters) … are subject to the Criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone."  65 F.R. § 31682-01, 31701.

88.     Similarly, the Basin Plan provides that absent any "allowance for dilution," waste discharges are prohibited unless "the quality of the discharge" meets its Criteria. Basin Plan at 4-19.

89.     Because the General Industrial Permit Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the General Industrial Permit. *See* 1997 Permit § C.2; 2015 Permit § VI.A; *see also Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 926 (C.D. Cal. 2009).

90.     "'Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action.' [Citation]." *Natural Resources Defense Council, Inc.* ("*NRDC*") *v. County of Los Angeles,* 725 F.3d 1194, 1204 (9th Cir. 2013).

91.     The General Industrial Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

92.     Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

/././

Complaint                                13

**E.** **The General Industrial Permit Storm Water Pollution Prevention Plan Requirements**

93. Section A.1.a and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A-B of the 2015 Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

94. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 Permit § X.

95. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 1997 Permit § A.2; 2015 Permit § X.G.

96. The SWPPP must identify site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. 1997 Permit § A.2; 2015 Permit § X.H.

97. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the General Industrial Permit. 1997 Permit § A.2; 2015 Permit §§ I.D.32, X.C.

98. The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs

Complaint                                    14

to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan, also referred to as a Monitoring and Reporting Plan. 1997 Permit §§ A.1-10; 2015 Permit §§ X.A-I.

99.   The General Industrial Permit requires the discharger to evaluate the SWPPP at least annually and revise it as necessary to ensure compliance with the General Industrial Permit. 1997 Permit §§A.9-10; 2015 Permit §§ X.A.9, X.B.1. The 2015 Permit requires dischargers to "certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s)." 2015 Permit § X.B.2.

100.   The General Industrial Permit requires dischargers to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit §§ A.9.a-c; 2015 Permit § XV.

101.   Section A.9.d of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the General Industrial Permit. 1997 Permit §§ A.9.d.i-vi. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with

the General Industrial Permit. *Id.* § A.9.d. The evaluation report shall be submitted as part of the Annual Report specified in § B.14 of the General Industrial Permit. *Id.*

102.    The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. 1997 Permit §§ A.1, B.3-4; 2015 Permit §§ I.J.55, X.B.1.

**F.    The General Industrial Permit Monitoring and Reporting Requirements.**

103.    The General Industrial Permit requires permittees to develop and implement a monitoring and reporting program ("M&RP"). 1997 Permit §§ B.1-2, E.3; 2015 Permit, §§ X.I, XI.1.

104.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.a-b; 2015 Permit §§ X.I, XI.

105.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43.

106.    The M&RP must ensure that storm water discharges are in compliance with the General Industrial Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit § B.2; 2015 Permit §§ I.J.55-56, XI.

107.    The M&RP shall be revised as necessary to ensure compliance with the General Industrial Permit. 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

108.    The General Industrial Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence

---

[1] The 2015 Permit refers to the M&RP as a Monitoring Implementation Plan or "MIP."

of unauthorized non-storm water discharges. 1997 Permit §B.4.a (monthly observations of each discharge location required); 2015 Permit § XI.A.1 (monthly observations of each drainage area required).

109.   Section B.4.c of the 1997 Permit and Section XI.A.2 of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges, and to eliminate unauthorized non-storm water discharges. 1997 Permit § B.4.c; 2015 Permit § XI.A.3.

110.   The General Industrial Permit requires dischargers to revise the M&RP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit § B.4.c; 2015 Permit § X.B.1.

111.   The General Industrial Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit §§ B.5, B.7; 2015 Permit § XI.B.4.

112.   The 1997 Permit defines Wet Season as October 1-May 30. 1997 Permit, Section B.4.a.

113.   Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

114.   Section B.5.b of the 1997 Permit required sampling to occur during scheduled facility operating hours that are preceded by at least three (3) working days

Complaint                                         17

without storm water discharge.

115.   Section B.15 of the 1997 Permit required dischargers participating in a group monitoring plan to collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit §§ B.5, B.7, B.15.

116.   Section XI.B.1 of the 2015 Permit requires sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

117.   The 2015 Permit defines Reporting Year as July 1st through June 30th. 2015 Permit § I.M.62.b.

118.   Section XI.B.2 of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

119.   Section XI.B.11 of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via California's Storm Water Multiple Application & Report Tracking System ("SMARTS") database within thirty (30) days of obtaining the results for each sampling event.

120.   Section B.5.c.i of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

121.   Section B.5.c.ii of the 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

122.   Section XI.B.6.a-b of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

123.   Section XI.B.6.c of the 2015 Permit requires dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water

Complaint                                                  18

discharged from the facility that serve as indicators of the presence of all industrial pollutants on a facility-specific basis.

124.    Section XI.B.6 of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads.

125.    Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

126.    Section C.11.d of the 1997 Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

127.    Section XVI of the 2015 requires dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. *Id.*

128.    The General Industrial Permit requires that all reports, certifications, or other

information required by the Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators. 1997 Permit § C.9; 2015 Permit § XX.K.

129.   The General Industrial Permit requires that signatories under Sections C.9-10 of the 1997 Permit, and Sections XX.K-L of the 2015 Permit, to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

### G.     The 2015 Permit Exceedance Response Actions Requirements.

130.   The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit §§ I.M.61-62; *id*. Table 2.

131.   When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *Id.* § XII.C.

132.   Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *See Id.* § XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Storm water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL

exceedances and to comply with the requirements of General Industrial Permit ("Level 1 Evaluation"). *Id.* §§ XII.C.1.a-c.

133.   Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.* § XII.C.1.c.

134.   Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. *Id.* §§ XII.C.2.a.i-ii.

135.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2.a.iii.

136.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b.

137.   A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the Reporting Year during which the NAL exceedance(s) occurred. *Id.* § XII.D.

138.   Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the Reporting Year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan

must identify which of the demonstrations in subsection D.2.a through c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for 1) a new parameter in any drainage area, or 2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area. *Id.* § XII.D.1.a.

139.   The Discharger shall certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) if this information has changed since previous certifications. *Id.* § XII.D.1.b.

140.   The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *Id.* § XII.D.1.c.

141.   All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id.* § XII.D.1.d.

142.   The Level 2 ERA Action Plan shall include a schedule and a detailed description of the tasks required to complete the discharger's selected demonstration(s) as described in subsections D.2.a through c of the 2015 Permit. *Id.* § XII.D.1.e.

143.   On January 1 of the Reporting Year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration, (b) Non-Industrial Pollutant Source Demonstration, or (c) Natural Background Pollutant Source Demonstration. *Id.* §§ XII.D.2.a-c.

144.   NAL exceedances as defined in the General Industrial Permit are not, in and of themselves, violations of the General Industrial Permit. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

145.   A "[d]ischarger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is

1   in violation of this General Permit." *Id.* § I.M.63.

2     **V.**    **<u>FACTUAL BACKGROUND</u>**

3       **A.**   **Facility Site Information, Industrial Activities, and Pollutant Sources**

4      146.   Plaintiffs are informed, believe, and thereon allege that Rohr first obtained

5   General Industrial Permit coverage to conduct industrial operations at the Facility on

6   April 6, 1992.

7      147.   Plaintiffs are informed, believe, and thereon allege that Rohr submitted its

8   most recent Notice of Intent ("NOI") to the State Board to obtain General Industrial

9   Permit coverage for the Facility on April 29, 2015 ("2015 NOI"), under Waste Discharge

10  Identification ("WDID") Number 9 37I004297.

11     148.   Plaintiffs are informed, believe, and thereon allege the Rohr Facility is

12  approximately 82 acres, approximately 95% of which is impervious surface. 2018

13  SWPPP § 3.1.

14     149.   Plaintiffs are informed, believe, and thereon allege that approximately 53

15  acres of the 82-acre Facility are covered.

16     150.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility is

17  currently an active industrial facility covered under the General Industrial Permit.

18     151.   The 2018 Rohr Facility SWPPP lists the standard industrial classifications

19  ("SIC") code for the Facility as 3728 "Aircraft Parts and Auxiliary Equipment, Not

20  Elsewhere Classified" within Sector AB, Transportation Equipment, Industrial, or

21  Commercial Machinery Manufacturing Facilities.

22     152.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility's

23  primary industrial activities includes "manufacturing structural and engine components

24  for aircraft. Industrial activities include metals casting and fabrication, and materials

25  manufacturing, handling, assembly, and storage. The manufacturing process includes tool

26  and die casting and shaping and milling of metal parts by machining and chemical

27  processes." 2018 Rohr SWPPP, § 3. Activities to support the manufacturing process

28  include "maintenance of and storing vehicles, recycling materials, and water treatment,"

1   and the operation of a Cogeneration plant. *Id*.

2   153.   Plaintiffs are informed, believe, and thereon allege that the other industrial

3   activities at the Rohr Facility include vehicle maintenance, hazardous materials storage,

4   metal die and tool storage, tool coating, equipment steam cleaning, shipping and

5   receiving, chemical storage, wastewater treatment, and salvage storage. *Id*.

6   154.   Information available to Coastkeeper and CERF indicates that these various

7   industrial activities occur throughout the Facility.

8   155.   Plaintiffs are informed, believe, and thereon allege that many of these

9   industrial activities occur outdoors without adequate cover to prevent storm water and

10  non-storm water exposure to pollutant sources, and/or without secondary containment or

11  other adequate treatment measures to prevent polluted storm water and non-storm water

12  from discharging from the facility.

13  156.   According to the 2018 Rohr Facility SWPPP, the "primary materials used

14  on-site in the manufacturing of the aerospace parts include the following: metals, such as

15  aluminum, titanium and steel; tools fabricated from lead, kirksite (zinc), plaster, and

16  steel; wood forms, and sand. Petroleum fuel products, solvents [i.e. methyl ethyl ketone

17  (MEK) and methyl isobutyl ketone (MIBK)], paints, acids, caustics and other hazardous

18  wastes are handled and stored onsite. The primary materials used for power generation at

19  the Cogeneration Plant include natural gas, diesel fuel, and lubricating oil." *Id*.

20  157.   Other "significant" industrial materials used at the Rohr Facility include

21  chromium compounds, nitric acid, sulfuric acid, acetone, glycol ether compounds, and

22  urea. *Id*., at § 4.

23  158.   Plaintiffs are informed, believe, and thereon allege that pollutants associated

24  with the Facility's industrial activities have been and continue to be tracked throughout

25  the entire site.

26  159.   Plaintiffs are informed, believe, and thereon allege that one or more of the

27  regulated industrial activities is conducted at locations throughout the entire Facility, and

28  thus the entire Facility requires General Industrial Permit coverage.

Complaint                                24

160.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire facility, no adequate BMPs or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

161.   Plaintiffs are informed, believe, and thereon allege that storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and thus all storm water discharges from the Facility are regulated under the General Industrial Permit.

162.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Rohr Facility generate significant amounts of numerous pollutants, as described *infra*. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

163.   Plaintiffs are informed and believe, and thereon allege, that the Rohr Facility Owner and/or Operator has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of non-storm water in violation of the General Industrial Permit and the Clean Water Act.

164.   Plaintiffs are informed and believe, and thereon allege, that the Rohr Facility Owner and/or Operator has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the General Industrial Permit.

165.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the General Industrial Permit. Plaintiffs further allege that elevated levels of metals, pathogens, nutrients, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

166.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Rohr Facility impact Coastkeeper

and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.    Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

167.   According to the 2018 Rohr SWPPP, the Facility consists of two drainage areas. *Id*. § 3.2. However, the Site Map identifies three discrete drainage areas.

168.   Storm water in Drainage Area 1 ("DA1") is collected by the Facility's storm water conveyance system ("SWCS"), and discharges into a tidal inlet that flows to San Diego Bay at Outfall 1. The ground surface of DA1 is entirely paved, and it is designed so that storm water is conveyed through sheet flow. *Id*.

169.   Outfall No. 1 is a 54-inch reinforced concrete pipe located just west of Building 61 and is the outlet for runoff from the northern part of the facility. It drains an area of approximately 57 acres. *Id*. § 3.2.1.

170.   Storm water in Drainage Area 2 ("DA2") is also collected by the Facility's SWCS and is discharged from the Facility via Station 2-WC-2. This storm water is then routed to Outfall 2 via the City of Chula Vista's Municipal Separate Storm Sewer System ("MS4"). *Id*. § 3.2.2

171.   According to the Rohr Facility Site Map and SWPPP, a third drainage area, DA3, collects storm water via the Facility's SWCS. Storm water from DA3 is also routed to Outfall 2 via the City of Vista MS4. However, storm water from DA3 discharges from the Facility via Station 2-WC-14, which is a separate piping system than discharges from DA 2. *See* Rohr Facility Site Map.

172.   Outfall No. 2 is located in the Chula Vista Marina (San Diego Bay) located to the west of the UTAS facility. 2018 Rohr SWPP § 3.2.2

173.   DA2 occupies approximately 20 acres, and DA3 occupies approximately 5 acres. *Id*.

**C.    The Rohr Facility Discharges Contaminated Storm Water in Violation of the General Industrial Permit.**

174.   Plaintiffs are informed, believe, and thereon allege that with every

significant rain event, the Rohr Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

175.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Rohr Facility Owner and/or Operator discharges polluted storm water are waters of the United States and therefore the General Industrial Permit properly regulates discharges to those waters.

176.   Plaintiffs are informed, believe, and thereon allege that storm water discharges from the Rohr Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the General Industrial Permit.

**1.  Discharges of Polluted Storm Water from the Rohr Facility Violate General Industrial Permit Effluent Limitations**

177.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility has discharged and continues to discharge storm water containing pollutant concentration levels above EPA Benchmarks without implementing BMPs that achieve BAT/BCT in violation of Sections B.3 of the 1997 Permit, and V.A of the 2015 Permit.

178.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Facility has exceeded the EPA Benchmark value for magnesium. For example, Defendant's monitoring data shows that every storm water sample analyzed for magnesium over the past five years has exceeded the EPA Benchmark value for total magnesium of 0.064 mg/L. Ex. A, (storm water sampling data enclosed with Notice Letter); *see also* MSGP Fact Sheet at 55-56.

179.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Facility has exceeded the EPA Benchmark value for zinc. For example, Defendant's monitoring data shows that almost every storm water sample analyzed for zinc over the past five years has exceeded the EPA Benchmark value for total zinc in saltwater of 0.09 mg/L. *Id*.

180.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Facility has exceeded the EPA Benchmark value for copper. For

example, Defendant's monitoring data shows that almost every storm water sample analyzed for copper over the past five years has exceeded the EPA Benchmark value for total copper in saltwater of 0.0048 mg/L. *Id*.

181.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Facility has exceeded the EPA Benchmark value for aluminum. For example, Defendant's monitoring data from February 27, 2018 indicates exceedance levels of aluminum at 1.95 mg/L, over twice the EPA Benchmark value for total aluminum of 0.75 mg/L at a pH between 6.5-9.0. *Id*.

182.   Plaintiffs are informed, believe, and thereon allege that storm water discharged from the Facility has exceeded the EPA Benchmark value for N+N. More specifically, Defendant's monitoring data shows numerous exceedances of the EPA Benchmark value for N+N of 0.68 mg/L during the 2015-16 and 2016-17 monitoring periods. *Id*.

183.   As EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards, Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, that the Facility has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 Permit § V.A.

184.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility's repeated exceedances of EPA Benchmarks over the past five years for pollutants, including N+N, magnesium, aluminum, copper, and zinc indicate that the Facility has failed and continues to fail to develop and/or implement BMPs that meet BAT/BCT.

### 2. Discharges of Polluted Storm Water from the Rohr Facility Violate General Industrial Permit Receiving Water Limitations

185.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility has violated and continues to violate multiple General Industrial Permit Receiving Water Limitations during every significant rain event.

186.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Facility has exceeded the CTR Water Quality Standards applicable to copper in California. For example, Defendant's monitoring data shows that almost every storm water sample analyzed for copper over the past five years has exceeded the CTR maximum concentration for total copper in saltwater of 0.0048 mg/L. *See* Ex. A, (storm water sampling data enclosed with Notice Letter); 40 C.F.R. § 131.38.

187.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the Facility has exceeded the CTR Water Quality Standards applicable to zinc in California. For example, Defendant's monitoring data shows that almost every storm water sample analyzed for zinc over the past five years has exceeded the CTR maximum concentration for total zinc in saltwater of 0.09 mg/L. *Id*.

188.    The Receiving Waters downstream from the Rohr Facility are impaired, and thus unable to support their designated Beneficial Uses.

189.    As discussion *supra*, San Diego Bay Shoreline at Chula Vista Marina is impaired for copper, and the Rohr Facility's storm water discharges contain elevated concentrations of copper, in exceedance of applicable Receiving Water Limitations, in almost storm water sample analyzed.

190.    A significant portion of the Facility's storm water runoff discharges directly into Chula Vista Marina via Outfall 2.

191.    Plaintiffs are informed, believe, and thereon allege that the Rohr Facility's storm water discharges contain elevated concentrations of copper, in exceedance of receiving water limitations, which cause and/or contribute to the copper impairment San Diego Bay Shoreline at Chula Vista Marina.

192.    Other sections of San Diego Bay are impaired for toxicity. The Basin Plan states that all waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life. Basin Plan at 3-26.

193.    Magnesium, zinc, and copper are considered toxic pollutants, and limitations

Complaint                                    29

on zinc and copper are specifically enumerated in the California Toxics Rules. 40 C.F.R. § 131.38. Moreover, Plaintiffs allege that discharges of elevated concentrations of magnesium, zinc, and copper cause and/or contribute to the toxicity impairment of Receiving Waters.

194.   Because the CTR and Basin Plan are applicable WQSs under the General Industrial Permit, Plaintiffs are informed, believe, and thereon allege that discharges from the Rohr Facility contain concentrations of pollutants that cause or contribute to violations of multiple applicable WQSs, and thus violate Receiving Water Limitation C.2 of the 1997 Permit and/or Receiving Water Limitation VI.A of the 2015 Permit.

195.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants in the storm water from the Rohr Facility also adversely impacts human health, thus violating the Permit Receiving Water Limitation C.1 of the1997 Permit, and VI.B of the 2015 Permit.

196.   Each time the Rohr Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time the Facility discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

197.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since April 26, 2014, and Plaintiffs will update the dates of violations when additional information and data become available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since April 26, 2014.

198.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the General Industrial Permit Receiving Water Limitations.

The Rohr Facility has been in violation since April 26, 2014, and Plaintiffs will update the dates of violation when additional information and data becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since April 26, 2014.

> **D.      The Rohr Facility Owner and/or Operator Has Violated and Continues to Violate General Industrial Permit SWPPP Requirements**

199.   The initial Rohr Facility SWPPP, dated June 11, 2015 ("2015 Rohr SWPPP"), was uploaded to the SMARTS database by the Rohr Facility Owner and/or Operator.

200.   The Rohr Facility Owner and/or Operator revised the Facility SWPPP in December of 2016 ("2016 Rohr SWPPP") to incorporate several updates including BMP modifications, additional storm water parameters, and to reflect the termination of certain operations such as pressure washing at the Facility.

201.   The Rohr Facility Owner and/or Operator revised the Facility SWPPP in March of 2017 ("2017 Rohr SWPPP") to incorporate several updates including a revision of the drainage acreage, revised bin management procedures, changes to the SWCS on observations.

202.   The Rohr Facility Owner and/or Operator revised the Facility SWPPP in February of 2018 ("2018 Rohr SWPPP") to reflect the level 2 ERA status of magnesium, copper, and zinc, and incorporate several changes to the Facility in response to this level 2 status.

203.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator has not revised the Facility SWPPP at any other time, and that the 2018 Rohr SWPPP is the current SWPPP that covers operations at the Rohr Facility.

204.   Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator has conducted and continues to conduct operations at the Facility with inadequately developed and/or implemented SWPPPs.

205.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Site

Maps have failed and continue to fail to adequately identify and describe structural control measures that affect industrial storm water discharges, authorized NSWDs, and/or run-on as required by the General Industrial Permit. *See* 2015 Permit § X.E.3.c.

206.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Site Maps have failed and continue to fail to identify all industrial storage areas and storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and other areas of industrial activity that may have potential pollutant sources, as required by the General Industrial Permit. *See id.* § X.E.3.f.

207.   Plaintiffs are informed, believe, and thereon allege that the Rohr SWPPPs have failed and continue to fail to adequately and/or accurately identify, describe, and assess all potential pollutants and pollutant at the Facility. For example, the Facility's sampling data shows that almost every storm water sample from the Facility contained concentrations of copper and magnesium exceeding effluent limitations and Receiving Water Limitations, and the 2018 SWPPP acknowledges copper and magnesium as "primary industrial pollutants detected in storm water at the facility." *See* 2018 Rohr SWPPP § 6.1.6. However, neither copper nor magnesium are specifically mentioned in the 2018 SWPPP's Table 6-1, Potential Pollutant Sources.

208.   Plaintiffs are informed, believe, and thereon allege that, due in part to the Rohr Facility SWPPPs' failure to adequately assess all pollutants and pollutant sources at the Facility, storm water discharged from the Facility contained numerous pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives in violation of the General Industrial Permit.

209.   Plaintiffs are informed, believe, and thereon allege that Rohr Facility Owner and/or Operator has also failed to revise the Facility's SWPPP to ensure compliance with the General Industrial Permit.

210.   Plaintiffs are informed, believe, and thereon allege that, despite the

significant concentrations of pollutants in the Facility's storm water discharges each and every year, information available to Plaintiffs indicates that the Facility SWPPPs have not been revised to include BMPs that adequately eliminate or reduce these pollutants, as required by the General Industrial Permit.

211.   Plaintiffs are informed, believe, and thereon allege that without properly identifying, describing, and assessing all potential pollutant sources at the Rohr Facility, the Facility Owner and/or Operator cannot and have not developed and/or implemented all appropriate BMPs.

212.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility SWPPPs fail to assess the BMPs with respect to the Facility's potential pollutant sources.

213.   As discussed *supra*, storm water discharges containing pollutant concentrations in exceedance of the General Industrial Permit Effluent Limitations, such as EPA benchmarks, and applicable Receiving Water Limitations, such as the CTR and Basin Plan, are indicators that a facility has failed to develop and implement BMPs that meet BAT/BCT.

214.   As discussed *supra*, Defendant's own sampling data demonstrates that the Rohr Facility discharged storm water with concentrations of numerous pollutants in exceedance of EPA Benchmarks values, CTR limits, and/or Basin Plan objectives.

215.   Because the Rohr Facility has discharged numerous pollutants in exceedance of Effluent Limitations and Receiving Water Limitations, Plaintiffs are informed, believe, and thereon allege that the Facility Owner and/or Operator has failed to develop and/or implement BMPs that:

      i.   adequately minimize the exposure of pollutants to storm water at the Facilities;

      ii.   adequately control and minimize polluted runoff from the Facilities;

      iii.   adequately treat and remove pollutants in storm water prior to the discharge;

      iv.   adequately prevent or control contaminated storm water from being

discharged from the Facilities; and

    v.  adequately prevent or control contaminated NSWDs from being discharged from the Facilities.

216.   Plaintiffs are informed, believe, and thereon allege that that the Rohr Facility Owner and/or Operator has failed and continues to fail to develop and/or implement SWPPPs for the Facility that contain BMPs that achieve BAT/BCT in violation of the General Industrial Permit.

217.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator has also failed to properly operate and maintain the structures and systems put in place at the Facility to achieve compliance with the General Industrial Permit and its SWPPP requirements.

218.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility SWPPPs fail to adequately analyze the effectiveness of the Facility's existing BMPs.

219.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Rohr Facility is in part a result of the Facility Owner and/or Operator's failure to develop, implement, and revise adequate SWPPPs.

220.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator's failure to adequately revise the Facility's SWPPPs, and thus failure to improve the Facility's BMPs, despite the numerous and repeated exceedances of Effluent Limitations, Receiving Water Limitations, and NALs identified in Defendant's own monitoring data, ensures that these exceedances will continue in violation of the General Industrial Permit.

221.   Every day the Facility Owner and/or Operator operates the Facility with an inadequately developed and/or implemented SWPPP, and/or without properly revising the SWPPP, is a separate and distinct violation of the General Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

222.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator has been in daily and continuous violation of the General

Industrial Permit SWPPP requirements since at least April 26, 2014. These violations are ongoing, and Plaintiffs will include additional violations when information becomes available.

**E.   Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring and Reporting Programs at the Rohr Facility**

223.   Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator has been and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised M&RP.

224.   Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator failed to conduct the required storm water analysis. For example, Defendant failed to monitor its discharges for aluminum until the 2015 Permit was adopted and its SWPPP was updated. However, aluminum was likely present in Rohr's storm water discharge prior to the amendment. *See* 1997 Permit § B.5.c.ii. Indeed, nothing in the 2015 SWPPP indicates a change in process resulted in the addition of aluminum to the list of constituents monitored and aluminum is listed as a pollutant associated with Sector AB in the EPA's Industrial Fact Sheet series.

225.   Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator's failure to include aluminum among the potential pollutants associated with industrial activity at the Facility, and to monitor its discharge for aluminum, constitute violations of the General Industrial Permit.

226.   Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator used improper monitoring and sampling techniques in analyzing Facility storm water samples for certain parameters. For example, the sample results for cadmium used test method SW6010B, which is not the appropriate method, nor was it sensitive enough to assess compliance with benchmarks and WQSs. The proper test method for cadmium is EPA. 200.8, as noted in the 2015 Permit, which Defendant attached to the 2018 Rohr SWPPP. *See* 2015 Permit § XI.B, Table 2.

227.   Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility

Owner and/or Operator failed to collect samples for the requisite number of QSEs.  For example, the Facility Owner and/or Operator failed to collect any samples from July 1 to December 31, 2017 in violation of the M&RP, which requires that two samples be taken during this time period. *See* 2015 Permit, §XI.B.2.

228.   Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator has failed to conduct visual observations and monitoring as required by the Permit's M&RP requirements. Based on information available to Coastkeeper and CERF, including Annual Reports and various inspection reports, the Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

229.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility M&RP has failed and/or continues to fail to ensure that BMPs have been adequately developed and/or implemented, or revised if necessary. *See* 1997 Permit, §§ B.2.a-b; 2015 Permit §§ X.I, XI.

230.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility M&RP has failed and/or continues to fail to ensure that storm water and non-storm water discharges are in compliance with the General Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations in violation of the General Industrial Permit. *See* 1997 Permit § B.2; 2015 Permit §§ I.J.55-56, XI.

231.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator has failed to revise each M&RP as necessary to ensure compliance with the General Industrial Permit. *See* 1997 Permit § B.2.d; 2015 Permit § XI.A.4.

232.   Because the Rohr Facility Owner and/or Operator has failed to revise each M&RP as required by the General Industrial Permit, each M&RP fails to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility in violation of the Permit. *See* 1997 Permit § B.4.c; 2015 Permit § X.B.1.

/./.

**F.    Defendant Has Failed to Comply with the General Industrial Permit's Reporting Requirements**

233.    Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the General Industrial Permit reporting requirements.

234.    In each Annual Report since the filing of the 2013-14 Annual Reports, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the General Industrial Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the General Industrial Permit, or will otherwise be revised to achieve compliance. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. For example, storm water samples collected from the Facility contain concentrations of pollutants above EPA Benchmarks and WQSs, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources. Further, as discussed *supra*, the Facility's SWPPPs do not include many elements required by the General Industrial Permit, and thus it is erroneous to certify that the SWPPPs comply with the General Industrial Permit.

235.    Facility operators must report any noncompliance with the General Industrial Permit at the time that the Annual Report is submitted, including 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 Permit, § XVI.B.2.

236.    Plaintiffs are informed, believe, and thereon allege, that the Rohr Facility Owner and/or Operator has failed to report numerous instances of non-compliance as required by the General Industrial Permit, as described *supra*.

237.    Each day that Defendant has operated and continue to operate the Rohr Facility without meeting each reporting requirement of the General Industrial Permit

Complaint                                    37

constitutes a separate violation of the Permit and the CWA.

**G.     The Rohr Facility Owner and/or Operator Has Failed and Continues to Fail to Comply with ERA Requirements**

238.   The Rohr Facility entered Level 1 ERA status in July 2016 for copper, zinc, and magnesium. *See* 2016 Level 1 ERA Report.

239.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator failed to conduct an adequate Level 1 status evaluation to identify additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances at the Facility. For example, Level 1 associated BMPs and SWPPP amendments likewise failed to address the Facility's continued failure to meet BAT/BCT. As a result, the Facility has continued to exceed NAL metrics in almost every storm water discharged sampled for copper, zinc, and magnesium.

240.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator has also failed and continue to fail to adequately revise the Facility SWPPPs to include additional BMPs necessary to prevent future NAL exceedances, as required by the General Industrial Permit. *See* 2015 Permit, § XII.

241.   Plaintiffs are informed, believe, and thereon allege, that the 2016 Level 1 ERA Report lacks the required detail and site-specific evaluation and analysis required by the 2015 Permit in violation of Section XII.C.

**H.     Unauthorized Non-Storm Water Discharges from the Rohr Facility in Violation of the General Industrial Permit Discharge Prohibition**

Plaintiffs are informed, believe, and thereon allege the Rohr Facility has discharged unauthorized non-storm water discharges in violation of the General Industrial Permit. *See* 1997 Permit § A.1; 2015 Permit § III.B. For example, the Facility SWPPPs identify fire-prevention sprinkler system discharges, air conditioning compressor condensate, and trapped rainwater as non-storm water discharges from the Facility. Furthermore, Defendant used a pressure washer prior to December 2016.

242.   Plaintiffs are informed, believe, and thereon allege that, although Defendant

claims that the non-storm water discharges listed above are purportedly authorized, these discharges do not qualify as authorized non-storm water discharges in Section IV.A of the Permit without implementation of adequate BMPs, or if the discharges are in violation of a Regional Permit.

243.   Plaintiffs are informed, believe, and thereon allege that the Rohr Facility Owner and/or Operator conducts these activities without adequate BMPs to prevent related non-storm water discharges.

244.   Moreover, the San Diego Regional MS4 Permit, § E.2.a. prohibits the discharge of unauthorized non-storm water as an illicit discharge. ("Building fire suppression system maintenance discharges (e.g. sprinkler line flushing) to the MS4 must be addressed as illicit discharges unless BMPs are implemented to prevent pollutants associated with such discharges to the MS4.").

245.   Furthermore, trapped rainwater is not listed among the authorized non-storm water discharges. San Diego Regional MS4 Permit, § E.2.a.(3)-(4). In fact, trapped rainwater released at a later time is subject to monitoring requirements for the discharge of contained storm water. 2015 Permit, § XI.B.4.b.

246.   Each time Defendant discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Plaintiffs will update the number and dates of violations when additional information becomes available. Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since April 26, 2014.

/./.

/./.

/./.

/./.

/./.

/./.

# VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Industrial Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

247.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

248.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

249.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

250.   The Facility Owner and/or Operator's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Industrial Permit and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; see also 33 U.S.C. § 1311(b).

251.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator violated and continues to violate the General Industrial Permit Effluent Limitation each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

252.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit Effluent Limitation at the Facility every day from April 26, 2014 to the present.

253.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit Effluent Limitation and the Clean Water Act are ongoing and continuous.

254. The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

255. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

256. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

257. By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 26, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

258. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

259. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of General Industrial Permit Receiving Water Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

260. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

261.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

262.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

263.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

264.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

265.   The Facility Owner and/or Operator's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit §§ C.1-2; 2015 Permit §§ VI.A-B; *see also* 33 U.S.C. § 1311(b).

266.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator violated and will continue to violate the General Industrial Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, discharge from the Facility.

267.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit Receiving Water Limitations every day from April 26, 2014, to the present.

268.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit Receiving Water Limitations and the CWA are ongoing and continuous.

269.   The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs is discharged from the Facility.

270.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the General Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

271.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 26, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

272.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

273.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the General Industrial Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

274.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

275.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

276.   Plaintiffs are informed and believe, and thereon allege, that the Facility

Owner and/or Operator has failed and continues to fail to adequately revise the SWPPPs for the Facility.

277.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP.

278.   The Facility Owner and/or Operator's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the General Industrial Permit and the Clean Water Act. *See* 1997 Permit § A; 2015 Permit § X; *see also* 33 U.S.C. § 1311(b).

279.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit SWPPP requirements at the Facility every day from April 26, 2014 to the present.

280.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit SWPPP requirements and the CWA at the Facility are ongoing and continuous.

281.   The Facility Owner and/or Operator will continue to be in violation of the General Industrial Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the SWPPPs for the Facility.

282.   Each day that Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

283.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 26, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

284.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs

have no plain, speedy, or adequate remedy at law.

285.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Discharges of Unauthorized Non-Storm Water in Violation of the General Industrial Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

286.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

287.   Plaintiffs are informed and believe, and thereon allege, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility.

288.   The Facility Owner and/or Operator's failure to prevent unauthorized non-storm water discharges is a violation of the General Industrial Permit and the CWA. 1997 Permit § A.1; 2015 Permit § III.B; 33 U.S.C. § 1311(a).

289.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has violated and will continue to violate the General Industrial Permit Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

290.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator has been in violation of the General Industrial Permit Discharge Prohibition every day from April 26, 2014, to the present.

291.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator's violations of the General Industrial Permit are ongoing and continuous.

292.   Each and every violation of the General Industrial Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

293.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 26, 2014, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

294.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

295.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

296.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A Court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the General Industrial Permit;

b.   A Court order enjoining Defendant from discharging pollutants without an NPDES permit;

c.   A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the General Industrial Permit and the Clean Water Act;

d.   A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $54,833.00 per day per violation for violations that occurred after November 2, 2015,

1   as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil

2   Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

3       e.      A Court order awarding Plaintiffs their reasonable costs of suit, including

4   attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

5   Water Act, 33 U.S.C. § 1365(d); and

6       f.      Any other relief as this Court may deem appropriate.

7

8   Dated: April 26, 2019

9                                           Respectfully submitted,

10                                          COAST LAW GROUP LLP

11

12                                          By: s/Livia B. Beaudin
                                            LIVIA B. BEAUDIN
13                                          Attorney for Plaintiffs
                                            COASTAL ENVIRONMENTAL
14                                          RIGHTS FOUNDATION
15                                          E-mail: livia@coastlawgroup.com

16

17                                          SAN DIEGO COASTKEEPER

18

19                                          By: s/Matt O'Malley
                                            MATT O'MALLEY
20                                          Attorney for Plaintiffs
21                                          SAN DIEGO COASTKEEPER
                                            E-mail: matt@sdcoastkeeper.org
22

23

24

25

26

27

28

Complaint                          47